2024 IL App (1st) 220583-U

No. 1-22-0583

Second Division
April 30, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) | No. 13 CR 10266 |
| v. | ) |  |
|  | ) |  |
| LAWRENCE DEL RUSSO, | ) | Honorable |
|  | ) | Michele M. Pitman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's convictions where the trial court did not err neither in denying his motion for a mistrial nor in admitting certain photographs into evidence at trial.

¶ 2    Following a jury trial, defendant-appellant Lawrence Del Russo was found guilty of first degree murder and armed robbery and sentenced to an aggregate 40 years in prison. Defendant appeals therefrom, arguing that the trial court erred (1) in denying defendant's motion for a

mistrial, (2) in admitting other crimes evidence, (3) in admitting photographs of unrelated knives, and (4) in instructing the jury on accountability. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     Defendant was charged by indictment with five counts of first degree murder for stabbing and killing Calvin Jefferson with a knife on May 4, 2013. He was also charged with one count of armed robbery, alleging that he used a dangerous weapon to rob Jefferson of cocaine.

¶ 5     On July 18, 2019, defendant filed a motion *in limine* requesting that the State be barred from presenting any evidence regarding the existence of unrelated knives seized from defendant's home. Before the court, defense counsel added that any and all pictures of knives that were taken from defendant's home also be barred. The State responded, stating that it wanted to present evidence that the police found a cabinet in defendant's home containing several knives and that there appeared to be a space where a knife was missing from the cabinet. The trial court granted in part and denied in part defendant's motion. In particular, the trial court agreed that the State would be barred from asserting that any of the knives recovered from defendant's home were the murder weapon but the State would be permitted to present crime scene photographs of the knife collection along with an alleged "empty space" from which the State hypothesized was the original location of the murder weapon.

¶ 6     The trial began on January 25, 2022, at which the following evidence was presented.

¶ 7     On the afternoon of May 5, 2013, Damu Patel, the manager of the HiWay Motel in Markam, Cook County, Illinois, went to Room 24, where Jefferson had been living, and she found the door unlocked, blood on the floor, and Jefferson unresponsive. Patel called the police, who determined that Jefferson was deceased and had been stabbed repeatedly. Patel allowed the police access to the motel's surveillance footage. The footage showed a white truck parked outside the

motel. On the recording, two individuals exit the passenger's side of the truck and walk out of view, in the direction of Room 24, which was not visible on the footage. The camera was motion activated. At 11:53 p.m., the same two individuals return to the truck and the truck drives away from the motel. The police recovered a white truck from Harmail Lal that matched the truck in the surveillance footage. After speaking with Lal, the police identified Kimberly Balog, Aaron Krysowaty, and defendant as persons of interest. Later, search warrants were prepared for defendant's home, as well as Balog's. There were also warrants for fingerprints, photographs, and DNA samples of defendant and Krysowaty.

¶ 8      Harmail Lal testified that he has known defendant for several years, and he met Balog and Krysowaty through defendant. He testified that, in 2013, he owned  a white pickup truck. He then testified repeatedly that he could not remember the events of May 4, 2013, or the details of his written statement or grand jury testimony. The State introduced Lal's statement and grand jury testimony into evidence as prior inconsistent statements and testimony.

¶ 9      In his statement, Lal related that, on the afternoon of May 4, 2013, he drove defendant and Krysowaty to the HiWay Motel to buy crack cocaine from defendant's drug dealer. The three smoked the cocaine in defendant's garage and Lal returned home. Later that day, Lal realized he had some money left and called defendant to ask if he could buy more crack cocaine. Lal informed defendant that he did not want Krysowaty involved because he did not want to split the drugs three ways, and defendant responded, "[D]on't worry, me and [Krysowaty] got to do business with the guy." Lal picked up defendant and Krysowaty from Balog's residence and defendant asked him to make a stop at his home, where he briefly entered the house and returned to the truck. Upon arriving at the motel, Lal offered defendant $7 but defendant responded that he did not need it. Defendant and Krysowaty exited the truck and "talked and whispered" before disappearing around

the side of the motel. Lal stayed in the truck the entire time. When the two returned a few minutes later, defendant had blood on his hand, a "possessed look" on his face, and a "Rambo style" knife in his hand. He heard defendant ask, "Did you get it?" and Krysowaty, who was holding a rock of crack cocaine, answered, "Yes." On the drive back to Balog's residence, defendant stated, "I got him a couple times, I really got his neck." Once they arrived at Balog's, Krysowaty gave Lal a small piece of the crack cocaine and Lal drove away.

¶ 10    Lal's grand jury testimony was largely the same, but he also testified to the following. On the following day, defendant called Lal and stated, "I don't want you saying nothing to no one." In a later conversation, defendant stated, "By the way, what happened the other day, don't worry about that. That dude is gone. He's gone. He's gone."

¶ 11    Kimberly Balog testified that, in May 2013 she was dating Aaron Krysowaty. On May 4, 2013, she was at home with Krysowaty when defendant arrived. That night, defendant and Krysowaty left together. She did not know where they were going or what they were doing. Around 11 p.m., they returned and defendant appeared distraught. She overheard defendant state to Krysowaty that he wanted to hurt somebody and Krysowaty agreed to accompany him. She testified that she did not recall anything else from that night. At this point, the State was allowed to refresh her memory with her statement to police. She testified that she heard defendant say that he needed a knife and she heard him rummaging through a drawer. She walked into the room and informed defendant that he would not be getting a knife from her home. The two men left together. They returned about an hour or two later, and she observed defendant standing outside with a bloody "Rambo knife" in his hand. She testified that the knife was about 10 to 12 inches in length. She heard defendant state that he "stabbed him." Defendant came inside, washed his hands, and threw the knife in the garbage can. She testified that Krysowaty took the garbage bag to a dumpster

behind her building. All three individuals then smoked the crack cocaine that Krysowaty had returned with. On cross-examination, she confirmed that she did not know who defendant wanted to hurt and she did not know why. She also confirmed that she did not see defendant with a knife when he left her house. She testified that Krysowaty had blood on his pants and his shoes when they returned.

¶ 12    Aaron Krysowaty first testified that he is currently in custody of the Illinois Department of Corrections pursuant to a plea of guilty to first degree murder of Jefferson. During the afternoon of May 4, 2013, defendant came over to Balog's apartment and the three of them drank alcohol and smoked crack cocaine. Krysowaty and defendant later went to defendant's house, where they continued to smoke crack cocaine. Eventually, they ran out of drugs and they discussed how they were going to acquire more. Defendant suggested robbing his drug dealer, Jefferson, and Krysowaty agreed to go with him. Defendant called Lal to pick them up in his truck. They first stopped at Balog's home, where defendant was speaking on the phone with his drug dealer and searching Balog's kitchen drawers for a knife. Balog stopped defendant and stated, "No you're not grabbing one of these."

¶ 13    They then drove to the HiWay Motel. When they arrived at the motel, Krysowaty followed about thirty seconds behind defendant to his drug dealer's room. By the time Krysowaty entered the room, defendant was on top of Jefferson, who was on the ground, and was stabbing him with an 8 to 10 inch-long knife. Krysowaty heard Jefferson "begging for his life," stating "No, don't kill me." Defendant directed Krysowaty to grab the drugs that were on the dresser. He did so and went back to the truck. When he left, defendant was still stabbing Jefferson. Defendant returned to the truck and Krysowaty observed that he was "covered in blood." Krysowaty gave a piece of crack cocaine to Lal and they took the rest back to Balog's apartment. While they were in the truck,

defendant stated, "I got him good" and "I think I killed him." At Balog's, defendant washed his hands and threw the knife in the garbage can. Krysowaty took the garbage bag and placed it in the hallway of Balog's building. They then smoked the crack cocaine and defendant left. While defendant was there, Krysowaty heard him say, "I think I killed my drug dealer."

¶ 14    On cross-examination, he clarified that they also stopped at defendant's house before going to the motel because "[defendant] had to grab something from his house." He did not see what defendant took from his house. He testified repeatedly that he did not know Jefferson and he did not stab Jefferson. He confirmed that there was some blood on his shoes and pants but not much. He confirmed that when he first spoke with police, he denied knowing anything about Jefferson's murder. On redirect examination, he testified that he initially denied knowing anything about Jefferson's murder because he did not want to get himself or anyone else in trouble with the police.

¶ 15    Officer Harlan Lewis, a law enforcement officer with the Markham Police Department, testified that, on May 5, 2013, around 2 p.m., he was called to the HiWay Motel. He was directed to Room 24, and upon entering that room, he observed the victim on the ground with multiple stab wounds. He then secured the scene. On cross-examination, he testified that he observed blood on the doorknob on the outside of the door to the room.

¶ 16    Lieutenant Heather Hansen, a patrol lieutenant with the Illinois State Police, testified that she was working as a crime scene investigator on May 5, 2013. She went to the HiWay Motel on that day and, inside Room 24, she observed red unknown stains on the tile floor and the deceased victim behind the door to the room. She also observed "quite a few *** blood patterns" on the floor, on the victim, on the wall, and on the inside of the door, and on the interior doorknob. She identified photographs she took of the crime scene. The photographs showed red stains on the victim's clothing and drug paraphernalia on top of a table, which included multiple lighters, a piece

of foil, and small plastic baggies. On the victim's person, she found $374. She later received from other law enforcement officers three packages, containing two pairs of blue jeans and two white tennis shoes. She observed red stains on the clothing items and they were sent to the lab for testing.

¶ 17     During a break in the trial, defense counsel raised an issue with the court regarding photographs that the State intended to admit into evidence which show an "empty space" in a cabinet in defendant's bedroom. Defense counsel reminded the court of its prior ruling on the motion *in limine*. Following argument, the court reversed its prior ruling on the photographs of the knives in defendant's home because "there is nothing that ties any knife collection that's found at the defendant's residence to this crime." The court stated that the evidence was prejudicial and ruled that the photographs would not be admitted. The court then ruled that the State's witness would be allowed to testify that knives were found in defendant's home and there was an empty space but the witness could not use the word "void."

¶ 18     Sergeant Dashun Walker, a police officer for the Village of Markham Police Department, was assigned to investigate the crime scene. He testified that, when he arrived at Room 24, he observed that the door was partially open and there was a "red blood-like substance in that area on the door handle" and "on the ground in front of the door [were] foot impressions that had red blood-like stains on them." He was unable to open the door because it was blocked by an object on the other side. Eventually, he squeezed through the opening and he observed the victim's body behind the door in a fetal position. While in the room, he recovered a cell phone and an Illinois identification card identifying the victim as Jefferson.

¶ 19     At this point, a sidebar conference was held to, once again, discuss the admissibility of photographs of knives found in defendant's room. Over defense counsel's objection, the court ruled that the photographs were admissible and were based on a reasonable inference. The court

expressly stated that it would not limit defense counsel's argument in response to the circumstantial evidence related to the "empty space."

¶ 20    Sergeant Walker testified that he executed a search warrant on defendant's home where he lived with his mother. In defendant's bedroom, he saw three knives displayed in a cabinet with glass doors. Photographs of this cabinet were admitted into evidence. He explained that there was an "[e]mpty space" next to the knives that appeared to have been "recently emptied" because "everything in the cabinet was covered in dust except for that one spot where the missing item was." One photograph showed that the empty space was about 13 inches in length. Sergeant Walker also testified that when collecting a buccal sample from defendant he observed a laceration to his right index finger.

¶ 21    On cross-examination, he testified that he did not recall seeing any drugs in the motel room and no drugs were seized from the room. He confirmed that he could not discern the physical characteristics of the individuals seen in the surveillance footage from the motel. He confirmed that he never saw the driver of the truck in the footage. He further testified that the search of defendant's home did not reveal any clothes with blood on them. He stated that he did not know what had previously been in that space in the cabinet but that it had been recently emptied because everything in the cabinet was covered in dust except for the empty space. He confirmed that, throughout this investigation, he never recovered a knife with Jefferson's blood on it, and none of the knives in defendant's bedroom had blood on them. He testified that he went to Balog's residence and nothing was recovered from the dumpsters outside her building and nothing was recovered from her residence.

¶ 22    Through the testimony of four forensic scientists (Brent Cutro, Heather Wright, Terrence Grom, and Christopher Webb), the State introduced evidence that showed that the interior

doorknob to Room 24 had both defendant's thumbprint and Jefferson's blood on it. Specifically, the evidence showed that: (1) there was a red-brown substance with some visible fingerprint ridge detail on the interior doorknob; (2) the doorknob was swapped and a latent print was found and preserved for analysis; (3) the DNA samples taken from the doorknob could not exclude Jefferson but defendant and Krysowaty were excluded; (4) the latent print on the doorknob matched defendant's left thumb print.

¶ 23    Finally, a medical examiner testified that Jefferson's autopsy revealed 23 stab wounds, 11 incise wounds, and some defensive wounds and bruises, several of the stab wounds were fatal injuries, and the manner of death was homicide. On cross-examination, she testified that, in her opinion, the wounds were caused by a knife.

¶ 24    During closing argument, the State argued as follows:

> "So through these four scientists it is determined that the defendant has the victim's blood on his hands, the defendant left a fingerprint in the victim's blood on the doorknob. That is what is established through those four scientists.
>
> So I submit that as the defendant is stabbing [Jefferson] to death [Jefferson's] blood got on the defendant's thumb, got on his hands, and when he touched the doorknob to leave, he transferred [Jefferson's] blood to that doorknob, leaving behind his thumbprint in the blood."

The State also displayed a slide on its PowerPoint presentation that included the forensic scientists' names and a similar statement, to wit: "The defendant has the victim's blood on his hands. The defendant left a fingerprint in the victim's blood on the interior doorknob."

¶ 25    After the State concluded its argument, defense counsel requested a sidebar, during which he objected to the statement that the evidence showed that defendant had the victim's blood on his

hands. Specifically, he argued that the State posed the statement as though it was scientific evidence, which was a misrepresentation. The State contended that the statement merely reflected a reasonable inference from the circumstantial evidence of the victim's blood and defendant's thumbprint on the doorknob. The trial court sustained the objection because of the way the statement was framed because there was no scientific evidence that defendant "had [Jefferson's] blood on his hand" and directed the State to remove the statement from the slide as well.

¶ 26    Defense counsel then moved for a mistrial based on the statement as it was presented as scientific evidence. The State argued that it was harmless error and that curative instruction from the court would be sufficient to resolve the issue. The court denied the motion for a mistrial, finding that it was not an intentional error on the State's part and the statement was based on a reasonable inference from the evidence presented.

¶ 27    The court allowed defense counsel to make his objection to the statement in the presence of the jury and the court sustained the objection. The court then stated to the jury:

> "[Y]ou are to disregard that statement. *** I have already informed you what the attorneys say is not evidence, but the attorneys are allowed to argue the actual evidence, any reasonable inference to be drawn from the evidence. So I'm going to sustain the objection and ask that you disregard that statement."

¶ 28    In closing argument for the defense, counsel argued that there was "no evidence in this case about any blood from the person of *** Jefferson on [defendant]."

¶ 29    In rebuttal, the State responded that "it is a reasonable inference as it relates to this defendant's contact with the victim's blood and that doorknob."

¶ 30    The court instructed the jury once again that "[n]either opening statements nor closing arguments are evidence. And any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 31    Subsequently, the jury found defendant guilty of three counts of first degree murder and one count of armed robbery.

¶ 32    On February 25, 2022, defendant filed a motion for judgment of acquittal notwithstanding the verdict or, in the alternative, motion for a new trial. Therein, defendant argued, *inter alia*, that the court erred in ultimately allowing testimony regarding a missing knife in defendant's cabinet and that the State's reference to the victim's blood on defendant's hand during closing arguments was improper. Before the court, defense counsel argued that the State should not have been permitted to "produce evidence before the jury which indicated that there was a missing space in this collection of knives[.]" On March 10, 2022, the trial court denied the motion, finding that the evidence regarding the empty space in the cabinet was proper and relevant and the closing argument was supported by the evidence and did not mislead the jury and any error was cured through jury instruction.

¶ 33    Following a sentencing hearing, the trial court sentenced defendant to 34 years on count 1 for first degree murder and a consecutive sentence of six years on count 6 for armed robbery.

¶ 34    This appeal followed.

¶ 35                              II. ANALYSIS

¶ 36    On appeal, defendant lists the following as the "Issues Presented for Review": (1) whether the trial court erred by denying the defendant's motion for mistrial; (2) whether the trial court erred by admitting other crimes evidence over defense objection; (3) whether the trial court erred by admitting photographs of unrelated knives over defense objection; and (4) whether the trial court

erred by including an instruction on the law of accountability over defense objection. Initially, however, we note that defendant provides no argument in his brief for the other crimes evidence issue and the jury instruction issue. As such, these issues are forfeited and will not be considered in this appeal. See *People v. Urdiales*, 225 Ill. 2d 354, 420 (2007) (a point raised in a brief but not supported by argument and relevant legal authority is forfeited).

¶ 37                          A. Motion for Mistrial

¶ 38    Defendant argues that his motion for a mistrial should have been granted due to the State's inappropriate and inflammatory comments during closing argument. Specifically, during its closing the State stated, "Through these four scientists it is determined that the defendant has the victim's blood on his hands, the defendant left a fingerprint in the victim's blood on the interior doorknob." A similar statement was included on a slide in the State's PowerPoint presentation. Defendant contends that there was no testimony to support the statement, it was being argued as scientific fact, and it was improperly included in the State's PowerPoint presentation. In response, the State argues that its argument was proper and any possible error did not warrant a mistrial.

¶ 39    "A trial court has broad discretion to determine the propriety of declaring a mistrial." *People v. Hall*, 194 Ill. 2d 305, 341 (2000). A mistrial should be granted where a grave error has occurred, such that defendant would be denied fundamental fairness. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). "To prevail on appeal, [the] defendant must establish that there was a manifest necessity for the mistrial or that the ends of justice would be defeated by continuance of the trial; that is, that the jury was so influenced and prejudiced that it would not, or could not, be fair and impartial, and the damaging effect of the evidence could not be remedied by admonitions or instructions." *People v. Wills*, 153 Ill. App. 3d 328, 339-40 (1987). A trial court's denial of a

motion for a mistrial will not be disturbed on review unless there has been an abuse of discretion. *Nelson*, 235 Ill. 2d at 435.

¶ 40    During closing arguments, a prosecutor is given wide latitude, and even improper comments do not merit reversal unless they result in substantial prejudice to the defendant. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. Further, the prosecutor has the right to comment on the evidence and draw all reasonable inferences from the evidence, even if they are unfavorable to the defendant. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *Wheeler*, 226 Ill. 2d at 122.

¶ 41    Here, defense counsel objected to the statement at issue, and the trial court sustained the objection and instructed the State to remove the statement from its PowerPoint presentation. Defense counsel then made a motion for a mistrial. The trial court ruled that the error was not intentional and opted to provide a curative instruction to the jury. The court expressly instructed the jury to disregard the State's statement regarding the victim's blood on defendant's hands and repeatedly instructed the jury that closing arguments are not evidence.

¶ 42    Clear from the record, the court recognized that the State poorly framed its reasonable inference from the scientific evidence such that it could have been misconstrued by the jury as conclusive scientific evidence itself.  The court sought to mitigate any improper consideration of the statement, first, by sustaining defendant's objection before the jury, admonishing the jury to disregard the statement, directing the State to remove the statement from the slide, and instructing the jury, a second time, that closing arguments are not evidence. We believe that the court's ruling and subsequent admonishments were sufficient to cure any potential prejudice resulting from this single statement. See *Wheeler*, 226 Ill. 2d at 128 (the act of sustaining an objection and properly

admonishing the jury is generally viewed as sufficient to cure any prejudice engendered by improper closing argument); see also *People v. Birge*, 2021 IL 125644, ¶ 40 (jurors are presumed to have followed the court's instructions).

¶ 43    Notably, defense counsel argued in closing that there was "no evidence in this case about any blood from the person of *** Jefferson on [defendant]." Clearly, counsel's uninterrupted argument, heard by the jury and coupled with the court's earlier admonishments, stood to rebut the State's earlier misstatement of the "scientific evidence." *People v. Wilson*, 257 Ill. App. 3d 670, 689 (1993) (any improper comment was sufficiently cured where the jury was properly instructed and defendant "had the opportunity to respond to the prosecutor's statement during his closing argument").

¶ 44    Further, we find defendant's characterization of the error as "blatant unsworn expert testimony" exaggerated. Just after the statement, the State continued: "I *submit* that as the defendant is stabbing [Jefferson] to death [Jefferson's] blood got on the defendant's thumb, got on his hands, and when he touched the doorknob to leave, he transferred [Jefferson's] blood to that doorknob, leaving behind his thumbprint in the blood." (Emphasis added.) We view the State's statement as an inartful attempt to draw an inference from the forensic evidence and as hypothecation of what that evidence could mean, as opposed to characterizing it as scientific fact. Thus, taken in context, we agree with the trial court that the error was not intentional and the State failed to appropriately couch the statement as a reasonable inference from the expert testimony.

¶ 45    Defendant also asserts that the evidence in the case was "closely balanced," suggesting that the improper argument had some potential of tipping the balance in the State's favor. We must disagree. In fact, we find that the evidence of defendant's guilt was overwhelming. Three witnesses gave corroborative accounts of the events of May 4, 2013, that strongly implicated defendant as

the individual who stabbed and killed Jefferson. Their accounts also aligned with the surveillance footage from the motel and the forensic evidence found at the crime scene. Moreover, the circumstantial evidence of the empty space near a collection of three knives in defendant's bedroom, as well as the testimony that defendant did not get a knife from Balog's apartment and went into his residence prior to going to the motel, leads to an inference that defendant had access to a knife similar to the one that the witnesses described and that could have been used to kill Jefferson. In sum, we find it unlikely that the error in the State's closing argument, which the court sufficiently remedied, was a material factor in defendant's conviction. See *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 29 (where a motion for a mistrial has been denied, in addition to establishing prejudice, an appellant must also demonstrate that court admonishments and curative instructions could not remedy the damage from the improper comments); see also *People v. Pinkett*, 2023 IL 127223, ¶ 33 (mistrial proper only where the defendant demonstrates actual prejudice).

¶ 46    Finally, we disagree with defendant's contention that this case is similar to *People v. Linscott*, 142 Ill. 2d 22 (1991). In *Linscott*, our supreme court reversed the defendant's murder conviction based on improper prosecutorial comments that misrepresented the State's evidence. *Id.* at 28. In particular, the prosecutor in closing argument commented that the defendant's hair had been found at the crime scene; however, the evidence merely showed that the defendant was in a class of possible donors of the hair. *Id.* at 30-31. The court concluded that the comment amounted to plain error because the evidence was closely balanced where the forensic evidence was crucial to identifying the murderer and there was no witness connecting the defendant to the murder or the murder weapon. *Id.* at 33-34; *People v. Linscott*, 159 Ill. App. 3d 71, 73-74 (1987), *vacated on other grounds*, 142 Ill. 2d 22 (1991).

¶ 47 Unlike in *Linscott*, the evidence in this case is not closely balanced, as we have explained. Additionally, we would not consider the State's comments here to be similarly egregious as those in *Linscott*. Here, the State unintentionally conveyed a reasonable inference from the testimony as scientific fact; however, the reasonable inference itself was appropriate, particularly where there was no dispute that the blood was Jefferson's and the fingerprint was defendant's. This is not the same as conclusively stating that a hair belonged to a person when the testimony was only that it was possible that it could belong to that person. For these reasons, we find *Linscott* inapposite.

¶ 48 We also reject defendant's citation to *People v. Smith*, 2012 IL App (1st) 173008-U, as Illinois Supreme Court Rule 23(e) does not permit the citation to nonprecedential orders entered prior to January 1, 2021, except in limited circumstances not applicable here. Ill. S. Ct. R. 23(e) (eff. Feb. 1, 2023).

¶ 49 Having reviewed the closing arguments of both parties in their entirety and considering the trial court's response to defendant's objection and admonishments to the jury, we reject defendant's argument that this isolated statement prejudiced defendant to the point of warranting a mistrial. Accordingly, we conclude that the trial court's denial of defendant's motion for a mistrial was not an abuse of discretion.

¶ 50                                    B. Evidence of Knives

¶ 51 Defendant also argues that the trial court erred in permitting the jury to view photographs of knives in defendant's home that were "not connected" to the crime. In response, the State asserts that this issue is forfeited because defendant did not object to the admission of the photographs during the trial and the issue was not included in his posttrial motion. In his reply brief, defendant requests plain error review in the event that this court finds the alleged error was not preserved. We first address the issue of forfeiture.

¶ 52    It is well established that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005). Based on our review of the record, we find that the error was sufficiently preserved for review. Defendant filed a motion *in limine* regarding this evidence which was argued at length before the trial court prior to trial. During the trial, two separate discussions were had over the admissibility of the testimony and photographs regarding the "empty space" in the cabinet, wherein defense counsel repeatedly noted his objection. Finally, in the posttrial motion, defendant argued that the court erred in allowing testimony regarding a missing knife in defendant's cabinet and, before the court, defense counsel argued that the State should not have been permitted to "produce evidence before the jury which indicated that there was a missing space in this collection of knives[.]" From this, we find it clear that defendant objected to the admission of any evidence regarding the empty space in defendant's cabinet where knives were found, and he raised this issue before, during, and after the trial. See *People v. Mohr*, 228 Ill. 2d 53, 65 (2008) (declining to tailor the forfeiture rule to require that the defendant make identical arguments at trial and in his posttrial motion and finding that the defendant's arguments were close enough to avoid forfeiture); see also *People v. Perry*, 224 Ill. 2d 312, 347 (2007) (finding that the defendant adequately preserved the issue even though the specific statements were not precisely the same statements as those mentioned in the defendant's posttrial motion). Thus, we deem the issue properly preserved and we need not resort to plain error review.

¶ 53    Evidentiary rulings are within the sound discretion of the trial court, and absent an abuse of that discretion, reversal is not warranted. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.*

¶ 54    Generally, evidence must be relevant to be admitted at trial. *People v. Williams*, 384 Ill. App. 3d 327, 333 (2008). "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 111 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). In particular, a weapon "is relevant if there is evidence to connect it with the defendant and with the crime." *People v. Jones*, 22 Ill. 2d 592, 599 (1961). Even if a party establishes the relevance of the evidence, the trial court may still exclude the evidence on the basis that it creates an unfair prejudice that substantially outweighs its probative value. *Tatum*, 2019 IL App (1st) 162403, ¶ 111.

¶ 55    In the instant case, the police searched defendant's home and discovered a number of knives in a cabinet. None of those knives were connected to the murder. The State sought to admit the photographs of the knives because they showed an "empty space" where a knife could have been, raising an inference that the murder weapon was taken from defendant's bedroom. The trial court allowed Sergeant Walker to testify as to what he observed in defendant's bedroom and, based on that testimony, the photographs of the cabinet and its contents were admitted.

¶ 56    Defendant contends that the trial court erred because there was still no evidence that connected to the crime charged and the photographs were highly prejudicial and "served little purpose other than to inflame the passions of the jury." In response, the State rejects defendant's assertion that the State was using the photographs to suggest that the knives shown in the photos were used in the commission of the murder. Rather, the State asserts that it was using the apparent absence of a knife as circumstantial evidence that defendant took a knife from his house when they stopped there prior to the motel and discarded it after the murder.

¶ 57    For the reasons that follow, we agree with the State.

¶ 58    We first find that the photographs of the empty space in the cabinet were relevant. The medical examiner testified that a knife was used in the commission of the murder. The photographs showed the contents of a cabinet in defendant's bedroom during the execution of a search warrant. Those contents included three knives, and as Sergeant Walker unambiguously testified, none of those knives were the murder weapon. There was, however, an empty space next to the knives that was surrounded by dust, suggesting that an item had been in that space recently. The empty space was approximately 13 inches in length, as shown in one of the photographs, and the witnesses' testified that the knife they saw in defendant's hand was approximately 8 to 12 inches long. Krysowaty and Lal also testified that defendant was not seen with a knife when they left Balog's apartment, but they stopped at defendant's home before going to the motel and defendant was seen after leaving the motel room with a knife in his hand. The photographs of the empty space, therefore, served as circumstantial evidence that defendant possibly removed an item from his bedroom before going to the motel that could have been used to kill Jefferson. Thus, a plausible connection was demonstrated and, thus, the evidence was relevant. See *People v. Lee*, 242 Ill. App. 3d 40, 43 (1993) ("A doubt whether the weapon was connected to the crime or to the defendant does not prevent the weapon's admission, so long as a reasonable jury could find a connection."). We now turn to whether the prejudicial nature of the evidence outweighed its probative value.

¶ 59    We first note that "*all* evidence offered at trial is prejudicial in that it is introduced for the purpose of proving the proponent's case or undermining the opponent's case; if it were not prejudicial, it would not be relevant." (Emphasis original.) *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 120. Our rules of evidence only prohibit unfairly prejudicial evidence. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 60    Here, the admission of this photographic evidence would be unfairly prejudicial had it been presented to suggest that, because defendant owned knives, he was more likely to be a dangerous person or to be Jefferson's murderer. However, contrary to defendant's assertion, the photographs were not admitted to show the other knives defendant owned. Rather, the purpose of the evidence was to show the space where another knife could have been, and, based on the other evidence presented during the trial, it was reasonable for the jury to infer that defendant took a knife from his bedroom that night and that knife was never found. As such, we believe the photographs were properly admitted circumstantial evidence that showed defendant potentially had access to a knife similar to the one used in the commission of the crime and that such a knife was missing from defendant's bedroom. See *People v. Hoffstetter*, 203 Ill. App. 3d 755, 772-73 (1990) (finding that circumstantial evidence that the defendant had access to a weapon similar to the one that must have been used but was never found was properly admitted).

¶ 61    Moreover, the jury was not left to wonder whether any of the other knives in defendant's cabinet could have been used in the crime. Sergeant Walker admitted that none of the other knives were connected to the murder. Additionally, defense counsel was able to argue this point, as well as any other weakness in the evidence's probative value. See *People v. Free*, 94 Ill. 2d 378, 416-17 (1983) (cautioning against confusing admissibility with probative value as the defendant may argue to the jury that the lack of probative value of certain evidence but cannot bar its admission).

¶ 62    We perceive no unfair prejudice in the admission of the photographic evidence. Even accepting that there was any, such prejudice was minimized through cross-examination and closing arguments. Moreover, as we have already explained above, the evidence of defendant's guilt was overwhelming, and as such, any potential prejudice caused by the admission of the photographs was harmless. Accordingly, we find no abuse of discretion.

¶ 63                                III. CONCLUSION

¶ 64    For the reasons stated, we affirm the judgment of the circuit court.

¶ 65    Affirmed.